UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| LILY GROUP, INC., | ) | Case No. 13-81073-BHL-11 |
| | ) | |
| Debtor. | ) | |

| | | |
|---|---|---|
| OFFICIAL COMMITTEE OF UNSECURED | ) | |
| CREDITORS, | ) | Adversary Proceeding _____ |
| | ) | |
| Plaintiff. | ) | |
| v. | ) | |
| | ) | |
| LC ENERGY HOLDINGS LLC & Platinum | ) | |
| PARTNERS CREDIT OPPORTUNITY MASTER | ) | |
| FUND LP, | | |
| Defendants. | | |

## COMPLAINT

The Official Committee of Unsecured Creditors ("Committee") appointed in the above captioned chapter 11 case ("Chapter 11 Case") of Lily Group, Inc. ("Debtor") files this complaint against Platinum Partners Credit Opportunity Master Fund LP ("Platinum") and its assignee LC Energy Holdings LLC ("LC" and together with Platinum may be referred to jointly as "Lender") and seeks a determination of the value of certain assets transferred to Platinum pursuant to a credit bid. The Committee has objected to the claim of LC ("Claim") and filed a motion for authority to prosecute certain claims against LC which would constitute further grounds for objection to the Claim of LC.

### Parties, Jurisdiction, and Venue

1. Lily Group, Inc. is the debtor ("Debtor") in the Chapter 11 Case.

1

2. Plaintiff Committee was appointed on October 18, 2013 by the United States Trustee [Case Docket No. 47] supplemented on November 25, 2013 [Case Docket No. 84] pursuant to 11 U.S.C.§ 1102(a)(1) by the United States Trustee. Faegre Baker Daniels LLP was engaged as counsel to the Committee pursuant to the Bankruptcy Court's order dated December 9, 2013 [Docket No. 104].

3. Defendant LC is a Delaware limited liability company registered with the Delaware Secretary of State as a domestic company on September 23, 2013 with an address of 152 West 57th Street, 4th Floor, New York, New York 10019. Defendant LC may be served with process by way of United States first class mail to the attention of Mr. Daniel Small at the address stated herein, and at its agent VCorp Services, LLC, 1811 Silverside Road, Wilmington, DE 19810-4345.

4. Defendant Platinum is a Delaware limited partnership registered with the Delaware Secretary of State as a domestic company on June 25, 2008 with an address of 152 West 57th Street, 4th Floor, New York, New York 10019. Defendant Platinum may be served with process by way of United States first class mail to the attention of Mr. Daniel Small at the address stated herein, and at its agent VCorp Services, LLC, 1811 Silverside Road, Wilmington, DE 19810-4345.

5. On information and belief, LC is wholly owned by Platinum or is an affiliate of Platinum.

6. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 & 1334 and Fed. R. Bankr. P. 7001(1),(2), and (8). This is a "core" proceeding pursuant to 28 U.S.C. 157(b)(2) (B),(C), (E), (F), and (H).

US.58733424.02

7.      Venue is proper in this district and division pursuant to 28 U.S.C. §§ 1391(b) and 1409(a).

Facts

8.      On September 23, 2013 ("Petition Date"), Debtor filed a petition for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 1010 *et seq.* ("Bankruptcy Code") commencing this Chapter 11 Case. The order for relief was entered on the Petition Date. Docket numbers for the Chapter 11 Case are designated herein as "Case Docket No. ___).

9.      Debtor is an Indiana corporation formed in August 2008 to own and operate an underground coal mine commonly known as the Landree Mine located in Greene and Sullivan Counties Indiana.  Debtor's assets consisted of owned and leased coal assets and certain agreements and permits without which the Landree Mine could not be operated.  On the Petition Date, Debtor owned twenty (20) acres of real property in fee simple on which the entrance and open pit to the mine is located ("Mine Pit").

10.     Debtor leased an additional 20 acres and improvements in two parcels (5 acres and 15 acres) adjacent to the Mine Pit that was used for office and equipment storage and staging and provides additional access to the Mine Pit ("Adjacent Lease").

11.     Debtor's coal assets consisted of about 1,350 acres of coal in a mineral estate owned by Debtor and lying underneath property owned by the State of Indiana known as the "Hillenbrand Property."

12.     Debtor had acquired an additional estimated 1,200 acres of coal under a lease with Western Pocahontas Properties Limited Partnership ("Pocahontas Coal Lease") that is also underneath the Hillenbrand Property.

US.58733424.02

13. Debtor, Western Pocahontas Properties Limited Partnership and the State of Indiana Department of Natural Resources are parties to an agreement that allows Debtor to use the Hillenbrand Property to access the coal owned and leased by Debtor ("Hillenbrand Agreement").

14. On information and belief, the majority of Debtor's coal assets can only be accessed pursuant to the Hillenbrand Agreement.

15. On information and belief, without the Hillenbrand Agreement, the Landree Mine would not be permitted nor operable.

16. The Hillenbrand Agreement controls the use of the surface property overlaying the coal estates owned and leased by Debtor. The use of the surface property described in the Hillenbrand Agreement includes:

> [M]ining and extraction of deep and surface mine coal, transporting coal (into, over, through the surface), coal stockpile areas, coal processing areas, surface drainage controls (sediment ponds and diversion ditches), coarse refuse disposal area, fine coal refuse disposal areas (slurry ponds), mine roads, water and slurry pipelines, mine conveyors, soil stockpile areas, exploration drilling from the surface, drilling of boreholes for injection of fine coal refuse and return of clarified water from abandoned underground mine works, boreholes for supply of electricity, boreholes for supply of rockdust, boreholes for pumping of mine water, shafts for access of men and/or supply of air for mine ventilation, and any other reasonable or statutorily required use of the surface for the lawful extraction of the coal contained within and/or adjacent to the premises.

Hillenbrand Agreement, paragraph 2.

17. Debtor also had two leases with the Indiana Rail Road Company: a lease for coal underlying a railroad right-of-way owned by the Indiana Rail Road Company ("IRR Coal Lease"); and a Sidetrack Agreement that details rail spur construction and a lease of an existing rail spur to allow Debtor to move the extracted coal by rail ("IRR Sidetrack Agreement").

18. On information and belief, the IRR Coal Lease provided for the sale of coal, the proceeds of which were used postpetition by Debtor.

19. The IRR Sidetrack Agreement is necessary to be able to move the coal mined from the Landree Mine off of the property for sale.

20. On information and belief, without the IRR Sidetrack Agreement, the Landree Mine would have to truck all coal from Landree Mine at costs exceeding any return on the sale.

21. On the Petition Date, Debtor had a three year contract with Indianapolis Power & Light to sell its extracted coal ("IPL Contract").

22. The IPL Contract provided for an above-market price for certain of the coal assets owned by Debtor.

23. On information and belief, the IPL Contract would not have been entered into had Debtor not had access to the coal pursuant to the Hillenbrand Agreement, been permitted for operations and been able to deliver the coal via the IRR Sidetrack Agreement.

24. On the Petition Date, the Landree Mine was fully permitted for operations.

25. P. Rick Risinger ("Risinger") incorporated the Debtor and was its sole shareholder and President.

26. In May 2011, Risinger entered into a letter of intent with VHGI Holdings, Inc. ("VHGI") to sell 100% of his shares in Debtor to VHGI.

27. VHGI was a publicly traded company, but on information and belief has been de-listed and is no longer in business.

28. In December of 2011, VHGI Coal, Inc. ("Coal"), a wholly owned subsidiary of VHGI, entered into a stock purchase agreement with Risinger to purchase all the stock of the Debtor.

US.58733424.02

29. On information and belief, the stock purchase closed in early February 2012.

30. As consideration for the stock, Risinger received a $17 million note from Coal ("Coal Note"), and 700,000 shares of Coal Series A convertible stock with a par value of $10 per share was issued to Risinger's other company, Lily Group Holdings, Inc. ("LGH"). Following the transaction, Risinger became the CEO of Coal.

31. On or about February 16, 2012, Platinum entered into a transaction ("Platinum Transaction ") with Debtor, Coal, VHGI, and other affiliates of VHGI under which Platinum purchased a promissory note from the Debtor for the purchase price of $13 million ("Debtor Note").

32. As part of the Platinum Transaction, Risinger subordinated his $17 million Coal Note to Platinum's security interests.

33. On information and belief, the Platinum Transaction was initially negotiated as a $30 million transaction with VHGI, but resulted in the $13 million Debtor Note and the $17 million subordination of the Coal Note.

34. The Debtor Note carried a ninety (90) day maturity date of May 16, 2012 and an interest rate of 12%, which date could be extended an additional ninety (90) days if Debtor entered into an extension agreement that called for Debtor securing equipment financing. The extension agreement if exercised would incur an additional $390,000 in fees owed by Debtor to Platinum and the interest rate would increase from 12% to 18%.

35. An additional 2.5% per month interest rate was added if there was a default under the Debtor Note, making the effective interest rate 36% if the rate was then 18%.

36. The Debtor Note included a closing fee of 10% of the principal or $1.3 million payable to Platinum at the closing along with legal costs and other fees resulting in $1,656,600 of the Debtor Note being paid to or on behalf of Platinum at the closing.

37. Almost $1.5 million of the Debtor Note was paid to Debtor's ultimate parent, VHGI and $616,000 was paid to Coal, Debtor's immediate parent.

38. VHGI, Coal, VHGI Gold LLC (a wholly owned subsidiary of VHGI) and VHGI Energy LLC (a wholly owned subsidiary of VHGI) guaranteed the Debtor Note to Platinum and Platinum took a pledge of all the equity stock of the guarantors, including all the stock of Debtor owned by Coal.

39. The remaining proceeds of the Debtor Note were used to retire certain commercial of Debtor and pay other obligations alleged to be owed by Debtor. Of the entire Debtor Note, between $450,000 and $710,000 of the $13 million Debtor Note was actually returned and used by Debtor for working capital for the development of the Landree Mine.

40. As security for the Debtor Note, Platinum received a security interest in essentially all assets and capital stock of the Debtor, VHGI, Coal, VHGI Energy LLC and VHGI Gold LLC. Platinum filed mortgages in Greene and Sullivan Counties Indiana (collectively, the "Mortgages") and a UCC financing statement with the Indiana Secretary of State's office to evidence its security interests.

41. Paragraph 5 of the "Collateral" description in the Mortgages specifically excludes the agreements listed on Mortgage Schedule 2.1(f) from the "Collateral" covered by the Mortgages. The agreements listed on Schedule 2.1(f) are the IRR Coal Lease, the IRR Sidetrack Agreement, and the Hillenbrand Agreement (collectively, the "Excluded Agreements").

US.58733424.02

42.     The Excluded Agreements are material and integral to the value of Debtor's assets and the value of the Landree Mine.

43.     On information and belief, without the Excluded Agreements and the operating permits, the coal and other assets of Debtor would have no value or be severely reduced in value.

44.     On May 15, 2012, the Note Purchase Agreement was amended to extend the termination date of the Debtor Note to May 25, 2012.  Debtor was charged a $50,000 amendment fee to Platinum for the amendment.

45.     On May 25, 2012, the Note Purchase Agreement was amended a second time to extend the termination date of the Debtor Note to June 15, 2012.  Debtor was charged a second $50,000 amendment fee and required to pay a $550,000 extension fee to Platinum for the extension.

46.     On June 15, 2012, the Note Purchase Agreement was amended a third time to extend the termination date of the Debtor Note to August 10, 2012.  Debtor was charged $100,000 plus legal fees for the amendment and $250,000 for the extension plus 18% interest on these new fees.

47.     On February 26, 2013, the Note Purchase Agreement was amended a fourth time ("Fourth Amendment").

48.     At the time of the Fourth Amendment, Platinum asserted it was owed the original $13 million in principal, plus accrued and unpaid interest of $2.92 million, plus an additional $800,000 in principal from the unpaid extension and amendment fees, plus outstanding legal fees and 18% interest on all amounts unpaid.

49.     As part of the Fourth Amendment,  Debtor entered into a new credit arrangement with Solomon Odon Howell, James W. Stuckert and Diane V. Stuckert (collectively, the

"Additional Lenders") to borrow $6 million in two notes, a $5 million secured note, and a $1 million unsecured note (collectively, the "Additional Lender Loan") purportedly to provide working capital and to pay certain prescribed costs including $500,000 to Platinum, Additional Lender Loan closing costs and legal fees of $135,700, a $68,500 fee on behalf of VHGI related to a conditional letter of intent for financing, and repay $510,000 borrowed from HEB Ventures, LLC in December 2012.

50. HEB Ventures, LLC is a company owned by one of the principals of VHGI and is asserted to have loaned monies to Debtor and had a security interest in Debtor that conflicted with Platinum's security interests.

51. At the time the Debtor incurred of the Additional Lender Loan, Debtor's outstanding trade payables and payroll totaled some $6.6 million (only $100,000 was current) and there were eight mechanics' liens filed against Debtor's properties.

52. On information and belief, Platinum assigned its rights in that certain Note Purchase Agreement dated February 16, 2012 between Lily Group, Inc. and Platinum and related documents to LC.

53. Debtor entered into a secured debtor in possession financing ("DIP Loan") with LC Energy and an agreement for Debtor to use cash collateral in which LC Energy claimed a security interest.

54. The DIP Loan was granted liens on all the assets of Debtor but only to the extent of the dollars actually lent under the DIP Loan.

55. The DIP Loan was not sufficient funding to allow the Landree Mine to extract and sell coal and generate operating income.

56. The total amount of the DIP Loan is believed to be around $650,000.

US.58733424.02

57. Without funding sufficient to operate the mine, the Debtor determined to sell its assets and operations.

58. Debtor filed separate motions to establish bid procedures for an auction of its assets. The bid procedures and sale motions established a bid deadline of January 13, 2014 with a sale hearing on January 15, 2014 ("Sale Hearing"), following an auction to be held on January 14, 2014 ("Auction").

59. On January 2, 2014, Debtor filed a motion to approve a Stalking Horse offer for its assets and authorize a break-up fee. Also on January 2, 2014, the Debtor moved to continue the dates for the bid submission, auction and sale hearing to January 22, 23, and 24, 2014, respectively.

60. The Committee filed its *Motion of the Official Committee of Unsecured Creditors to Limit Credit Bidding in the Sale of Debtor's Assets* ("Limiting Motion") on January 8, 2014 [Case Docket No. 153]. The Limiting Motion sought a limitation on the ability of LC to credit bid at the Auction including a determination of the value of the Excluded Agreements to the Sale purchase price ("Purchase Price") against which LC and/or Platinum did not have a valid security interest (the "Non-Lien Assets").

61. LC filed an objection to the Limiting Motion on January 17, 2014 ("LC Objection") [Case Docket No. 208]. The Committee filed a reply on January 21, 2014 ("Reply") [Case Docket No. 208].

62. The Limiting Motion, LC Objection and Reply were settled by agreement between the Committee and LC by order entered February 3, 2014 ("Agreed Order") [Docket No. 262]. The Agreed Order provided that LC could credit bid at the proposed Auction, but

preserved for later determination any and all disputes as to the Claim and the contribution of the value of the Non-Lien Assets to the Purchase Price which value would be paid to Debtor's estate.

63. The Auction was held on January 27, 2014, at which LC credit bid its Claim in the amount of $9 million plus an additional $9 million as a royalty payment over 12 years ("Credit Bid").

64. The Court entered an order on February 28, 2014, approving the sale to LC, however the approval was subject to an asset purchase agreement to be negotiated among the Debtor, the Committee, and LC [Case Docket No. 302]. The asset purchase agreement was negotiated and dated March 31, 2014 and preserved any and all disputes as to the Claim and the amounts if any that LC would have to pay to the Debtor's estate in cash for the value of the Non-Lien Assets and the difference between the value of the Credit Bid and the final allowed amount of LC's Claim.

COUNT 1 – Recovery of the Value of the Non-Lien Assets to Debtor's Estate

65. LC did not have a lien in the Non-Lien Assets and therefor LC could not acquire the Non-Lien Assets by credit bid.

66. The Landree Mine was sold as a whole operating entity at the Sale Hearing for a lump sum Purchase Price.

67. The Landree Mine could not be operated without the Non-Lien Assets.

68. The value of the Landree Mine's owned and leased coal and other assets are dependent on the value of the Non-Lien Assets and without the Non-Lien Assets, access to the owned and leased coal assets and operation of the Landree Mine would not be possible.

69. The Non-Lien Assets contributed not less than 50% of the value of the Landree Mine.

70. Without the Non-Lien Assets, the Landree Mine would not be permitted.

71. LC owes the value of the Non-Lien Assets it purchased to the Debtor's estate.

WHEREFORE, the Committee requests that the Court find that the Non-Lien Assets have a value of not less than half of the Purchase Price and order LC to pay that value to the Debtor's estate, net of the final determined amount of the DIP Loan and for all other and proper relief.

>Respectfully submitted,
>
>FAEGRE BAKER & DANIELS LLP
>
>By:  /s/ Terry E. Hall
>
>*Counsel for the Official Committee of Unsecured Creditors*

Terry E. Hall (#22041-49)
Dustin R. DeNeal (#27532-49)
300 N. Meridian Street, Suite 2700
Indianapolis, IN 46204-1750
Telephone: (317) 237-0300
Facsimile:  (317) 237-1000
terry.hall@faegrebd.com
dustin.deneal@faegrebd.com

July 1, 2015

US.58733424.02